The first case is case number 21-2007, United States v. Woody. Would the Appellant's counsel please approach and state your appearance? Good morning, Your Honors. Todd Hotchkiss on behalf of Appellant Francis Woody. Please court, Ms. Velez. Mr. Woody was convicted at trial of one count of aggravated sexual abuse on Jane Doe 1 and two counts of aggravated sexual contact on Jane Doe 2. I raised four issues on appeal. Two suppression issues regarding the April 25, 2018 statement by Mr. Woody, the October 23, 2018 statement by Mr. Woody, Dr. Pallone's expert medical testimony, and the substantive reasonableness of the life sentence. Regarding the first issue, we submit that Mr. Woody did not freely and voluntarily and intelligently consent to speak to Agent Zerker on April 25. Judge Browning below had recognized the undisputed fact that Mr. Woody had never been told at any point in time that he could not answer questions and was free to continue to work on the vehicle that he was working on on private property. And Judge Browning held standing alone, that was not enough. We submit that it did not stand alone for the following reasons. One, Agent Zerker and the other agent, Agent Clancy, had to go on to private property without a warrant or prior permission. But that wasn't his property, so he probably, does he have any right to even complain about that? I did not raise it alone as a seizure issue or a search issue, Your Honor. I raised it as a matter of the consent issue. And I see he has standing to challenge whether it was a consent or not. And under the implied license theory and the fact that on the record, the private property, he was not in a home. But he was on private property. This is not like he was walking down the street. He wasn't at a gas station like in the Jones case. He remained on private property. Pardon me? He remained on the private property. Correct. He was never taken into custody. Well, we believe he was as a result of the fact that this was not a consensual encounter. Ultimately, we believe and submit he was. There's no evidence to support it, though. Well, again, Judge Browning held standing alone the fact that he was not advised he could refuse, which this Court has held as strongly indicative of a consent. That did not happen. Of course, the fact that it didn't happen is just one factor. It's not. I think Judge Browning properly considered it as one factor. He held standing alone, it's not enough. Well, that's right. Standing alone is not enough. You're not contesting that. Well, what I'm submitting is there are other factors. So it did not stand alone. The fact that it was on private property. This is not Mr. Woody did not do anything to open himself up. This is even different than being in a private home where he could choose not to answer the door. He was working on a car. They walked up, got to within eight feet of him based on the record. He came out from under the car. The agent flashes his credentials, and within one minute, we get to the first other factor, within one minute, Agent Zerker says, suggest to go inside the home. So to go from a public, a more public viewing of the encounter, which this court has held is an important factor in determining whether it was custodial or not. Within one minute, Agent Zerker says, suggest to go in the home. Well, the question is, with respect to all these factors, is how coercive were they? And I don't see anything coercive about suggesting, how about we go into the home? He consents. They walk into the home. How is that any different than a knock and talk at a private home? I mean, if it was his home. This is a private home, but I'm not seeing the coerciveness of that. Because at that point in time, the person is already in their home. Here, the person was not in the home. The person was publicly, could be publicly viewed. What was the coercive factor about that? Did they force him to go into the home? Well, after walking onto the property without permission and everything, flashing the credential, it's the show of authority. And after they go into the residence, then additional factors arise that are really not in dispute in the record either. That is that the questioning is, there's an hour of questioning. And the questioning is quite accusatory. And in the first half of the questioning, Mr. Woody denies any criminality. Were they in a closed room in the house? Or was the room, were they just in an open area of the house? Did they have a door shut or locked or barricaded or anything? They went from the outside into a house. Right, but inside the house, it was open area. They weren't in a closed room inside the house. I don't think the record indicates that. Right, okay. Very honestly. My point is they went from a publicly, ability to be publicly viewed to a private, non-publicly viewed place. Then while they were in there, the record is without dispute that Agent Zerker, in questioning, the questioning was long. Mr. Woody, for the first half of it, does not incriminate himself. And then Agent Zerker uses both some false statements that he admits were false and some imperative statements that even the court recognized were imperative statements. And it was only after all of those things happened that Mr. Woody then incriminates himself. And so it's the totality of those circumstances. I don't understand how the alleged falsity of the agent's statements contributes to the confinement issue or the custodial issue. Mr. Woody had not been informed that he had the right to not answer questions. Agent Zerker, at page 41 of the suppression hearing transcript, says, and I quote, in response to questioning from me, on this point of untruthfulness, I would say I'm being untruthful with Mr. Woody. Whether or not he wants to keep talking to me would be up to him. If he doesn't know he can refuse to talk and the agent is using false statements to get him to continue to talk, this is where we get across the line into how is this consensual, how is this freely and voluntarily and intelligently made by Mr. Woody to a situation that is very much like custody and well beyond an investigatory seizure into more like full custody. That's my argument. Judge Browning did not address the false statements issue in his findings. He did reference the imperative statements and recognize some were made. Could you go back to the false statement? What's your best case in terms of suggesting that this particular false statement was coercive? This is admittedly difficult, Your Honor. My best case is not the world's strongest case, I have to admit. The Harrison case, which was a bomb in the house, but here's where... Pretty different scenario. How did we get there? Here's my best shot, Your Honor. Agent Zuercher admitted that this false statement was saying that the alleged digital penetration was no big deal, suggesting that he wouldn't be prosecuted for it. And I got Agent Zuercher to say that he admitted that either way he could face a life sentence, a 30-to-life sentence, and that's a pretty big deal. So when you go from a bomb that could kill somebody to a sentence that could imprison somebody for life in prison, that's where it gets to be closer, and that's the best case. But the additional support comes from the Frazier v. Cup where it says it's unduly coercive and using false statements. And here in the totality of these circumstances, and this is where I keep going back to, not being advised... The case law, as I'm familiar with it, says that if it's a false statement about your ability to leave, that might increase coerciveness, such as you could be endangered if you leave or something awful will happen to you. But if it's a false statement about the merits of the investigation, that is not creating a confinement. I think you can't just call all false statements the same. I think it depends. I understand, but I think looking at Agent Zuercher's testimony, he admitted that he was trying to get Mr. Woody to talk and keep talking. And in fact, after this happened is when Mr. Woody then begins to make incriminating statements. So the gist of my argument on this point is that Judge Browning was wrong because the failure to advise him of his right to not talk did not stand alone, and that there were these other factors, and the totality rendered it unconsensual beyond an investigatory seizure into an arrest. Regarding... I'm going to skip to the third issue for the sake of time. Skip to what, I'm sorry? I'm going to skip to the third issue, Judge Kelly, regarding the admission of Dr. Cologne's testimony. The record is clear. There was no evidence developed as a result of the examination. Nothing in the medical examination showed any evidence of any criminality. The only thing that came out of the examination was the statement by Jean Doe 1 that she had been sexually abused by Mr. Woody. Consequently, while I made an argument under 8034, I made an argument under 702, we believe that the 702 applies, and the Charlie case applies, and the Hill case applies, because there was no medical evidence, and because this was just Dr. Cologne vouching for the credibility of Jean Doe 1 by merely repeating... Well, what about the doctor's comment that it's important to know whether it was a familial situation or a stranger, and with respect to where she's staying, why isn't that all very pertinent to give further information to the psychiatrist or the psychologist at a later point? Under 803, that is hard to deny. It's what, I'm sorry? Under 803, Your Honor, that is very hard to deny, I admit, under law. That's why I say that it is really decided under 702, because it's not a fact that under 702 assists the trier of fact, like under the Charlie case, and vouches for the credibility of Jean Doe 1, because it's not rooted in the scientific, medical, or technical expertise of the expert. We're not talking about the trier of the fact. We're talking about a medical doctor who might need to know that it was a family member and take appropriate steps from that point. I understand, Your Honor. That doesn't, in my opinion, render it admissible under 702, though, because under 702 it has to assist the trier of fact at the trial. That value may have value to other people, but at Mr. Woody's trial under 702, through that witness, like in the Charlie case, because it wasn't rooted in the examination, because there wasn't any physical evidence. Sure it was rooted in the examination. Pardon me? It was certainly rooted in the examination. You can't isolate each little piece. You've got to look at the whole picture. I am. I am. And what I am is like in the Charlie case when there was no evidence physically or medically. It was just the statement that the victim made, the alleged victim made, just like in the Charlie case and in the Hill case. It's not just like in the Charlie case. That issue was about the admissibility of the expert testimony in general, not hearsay testimony of the physician who heard the statement about who the perpetrator was. That's an entirely different setting. Yes, I understand, and I objected under both bases at the trial court level. The judge did not address the 702 issue. I raised it on appeal, and I am out of time. You are. Thank you. Thank you. Thank you, counsel. Thank you. Good morning. May you please take the floor? My name is Raquel Ruiz-Velez. I'm an assistant United States attorney for the District of New Mexico. Mr. Woody argues that agents made false statements during the interview and that they were not truthful to him, but this court has held that law enforcement may use deceptive tactics in speaking with suspects so long as those tactics are not coercive. And in this case, the tactics did not compel Mr. Woody to answer questions. They did not involve safety concerns. There were no promises of leniency. There were no misstatements of the penalties that Mr. Woody could face. So the mere fact that the agent made deceptive statements does not mean that those tactics were coercive. So on the promises of leniency, you argue that the statements that it's no big deal was not the equivalent of a promise of leniency, or at least an implication of leniency. That's correct. Mr. Woody was not told that he would not face any charges if he... Nobody was told it's not a big deal. And the agent testified that he was using investigative techniques such as minimization, rationalization so that he could be built report with Mr. Woody, because they were talking about something very sensitive that most people would not admit to. So lying is an investigative technique? Deceptive tactics. Pretty big, important lie. So long as they're not coercive. It wasn't really a big deal. It certainly was a big deal. It was a big deal, because for that, Mr. Woody is facing a term of life in prison. But using that technique, investigative technique, was not coercive. He didn't say that you are not going to face a term of imprisonment and that if... That was the implication, certainly. Pardon? That was the implication. I mean, if he had said you're not going to face a term of imprisonment, as I understand your argument, it wouldn't have made any difference to our analysis, because it wasn't coercive. And that's another thing. This is just one factor out of the other factors that this report took into consideration. So we need to look at this interview based on the totality of the circumstances. But I'd like a more specific answer to Judge Morris's question. What if he had said you're not going to face significant charges? Would that have made it coercive? That could be coercive, and that's not what happened in this case. I know that, but I'm just asking. It could be coercive. Why could that be coercive? Because that would be a promise of leniency. And hearing the agent didn't promise Mr. Woody that he would not face any charges. Where do we draw the line between a promise and simply a strong suggestion or a strong prediction? I can't promise it, but my gosh, it sure looks good if you cooperate. That would be a promise or saying that I would talk to the prosecutor and say, because you cooperated with us, please don't prosecute him or please just be lenient with him with regard to sentencing. That would be a coercive promise. Thank you. And in this case, the interview was consensual and remained consensual throughout the entire time. There were only two agents that had contact with Mr. Woody. They were in an under-marked vehicle. They were dressed in plain clothes. They didn't have their weapons displayed. And then when the agent, agent Serker, asked Mr. Woody if they could talk in a private area, Mr. Woody agreed and led them, led the agents to the residence, his niece's residence. And they sat, Mr. Woody sat on a couch close to the door and the agent sat on another couch three or four feet away from Mr. Woody. At no point, Mr. Woody was searched. He was not pat down. He was not, the residence was not searched. Mr. Woody was not handcuffed. And actually, the agents didn't touch Mr. Woody probably until the end of the interview for a handshake. So the record is clear that they were not in a closed room in the house. It was in the open living room area, according to your statement just now to us, on two couches. Yeah. It's just that we didn't specify, the record does not specifically say what room. But it sounds like it was in the living room. Where did this information come from that you just told us about two couches? That came from the case agent. And one could assume that it was the living room. Is that in the record?  Yes, that they were sat on a couch. So based on the totality of the circumstances, the district court was correct in denying Mr. Woody's motion to suppress these statements. With regard to issue number three, the district court allowed statements made by Jane Doe Wan to Dr. Pilon. Dr. Pilon is an emergency physician and he was listed as an expert witness so that at trial he could render an opinion as to how, in certain circumstances, sexual abuse does not produce injuries to the victim. But he was also a fact witness in this case because he examined Jane Doe Wan when Jane Doe Wan disclosed the sexual abuse. And as part of the medical examination, which Dr. Pilon said is called the chief complaint and history of present illness, he asked Jane Doe Wan background questions. And that's when Jane Doe Wan identified Mr. Woody as her stepfather and the person who touched and kissed her. And those statements are important and pertinent to diagnosis or treatment because in sexual abuse cases, cases such as in this case, the identity of the abuser is necessary to determine the appropriate course of treatment, which may include removing the child from the home. And in this case, Jane Doe Wan was on an unsafe environment when the sexual abuse occurred. And when this happened, Jane Doe Wan's father testified that he shared custody with Jane Doe Wan's mother. And Jane Doe Wan's mother was residing with Mr. Woody at Mr. Woody's house. So that statement is important and pertinent to treatment. Could you address, I noticed you didn't address, I don't think you addressed the Charlie case. He relied on that in the district court, Mr. Woody did, and he relied on it again in his appellate brief. And I didn't see you address that anywhere in your response brief. So could you address that as well as his argument about 702? So in that case, if I'm remembering correctly, it was related to expert witnesses. And in that case, it was different because I believe the government wanted to present the testimony of the doctors as expert witnesses. They were not fact witnesses. And they, so the case was, so the evidence was wanted to be introduced through expert witnesses as opposed to fact witnesses. So it was, it's completely different to what we have here. We have here a fact witness, and Dr. Pilon examined Jane Doe Wan, and Jane Doe Wan made those statements to him. Thank you. So based on that the district court was correct in admitting those statements under the hearsay exception rule 803, subsection 4. But if the district court abuses discretion in admitting those statements, the error was harmless. The evidence presented at trial against Mr. Woody was overwhelming. And the government presented the testimony of Jane Doe Wan and the testimony of Jane Doe too. And both victims identified Mr. Woody in open court. The jury listened to the audio recordings containing Mr. Woody's admissions. And the jury was able to see the two apology letters that Mr. Woody wrote to both victims and he signed. And they also saw a hand drawing showing how far Mr. Woody digitally penetrated Jane Doe Wan. So Jane Doe Wan's statements to Dr. Pilon were brief in comparison to the overwhelming evidence that was presented at trial against Mr. Woody. So if there was error, the error was harmless. With regard to the second interview that occurred in October 2018, that interview occurred six months after the first interview. And Agent Serker contacted Mr. Woody and set up a meeting with Mr. Woody at the New Mexico State Police substation in Cuba, New Mexico. It is true that a police substation is not a public place and it may be a police-dominated environment. But in this case, it was not necessarily a coercive environment. So according to Agent Marcus McCaskill's testimony, the interview was scheduled at that police substation because it was convenient for Mr. Woody and for the agents. And that morning, Mr. Woody went to the police substation and he met with Agent Serker and Agent McCaskill. Mr. Woody was not searched, he was not handcuffed, he was not pat down. And the agents were dressed in plainclothes. Agent McCaskill testified that he was not armed and Agent Serker testified that he did not have his duty weapon exposed. And upon arrival at the police substation, as I said, Mr. Woody was not searched. He did not have any contact with any state police officer at the substation. And Agent McCaskill and Woody went to a separate room. But that room was, the door was closed before the interview, but the door was not locked. And Agent Serker stayed outside the room. During this encounter, the agent's tone of voice was normal and conversational. And before any questioning, Agent McCaskill explained to Mr. Woody the process of the polygraph exam. He went over the advice of rights form with Mr. Woody. He explained to Mr. Woody his rights in everyday common language. And Mr. Woody agreed and signed the advice of rights form. Agent Serker also went over the consent to interview with polygraph with Mr. Woody. And Mr. Woody signed, indicated that he understood his rights and signed the consent to interview with polygraph form as well. Also, when Mr. Woody didn't give clear answers to Agent McCaskill during the advice of rights form portion, Agent McCaskill made sure that Mr. Woody understood his rights. And he gave him his options. If he wanted an attorney, that was his option. If he didn't want to be interviewed without an attorney, that was his option too. And then at the end, Mr. Woody signed the advice of rights form, indicating that he understood his rights. So Agent McCaskill did not conduct a polygraph test on Mr. Woody or the part of the examination when the polygraph instrument is attached to Mr. Woody because Mr. Woody confessed during the pre-face interview. So the agents proceeded with the post-polygraph interview, which was audio recorded. And that recording clearly shows interaction between the agents and Mr. Woody. So the district court was correct in determining that this second interview was voluntary and that there was no Miranda violation because Mr. Woody was not in custody. But if Mr. Woody was in custody, the district court found that Mr. Woody knowingly waived his rights before answering any questions. And unless the court has any questions for me, we ask the court to affirm the judgment and sentence. Thank you. Thank you, counsel. We appreciate your arguments today. The case will be submitted and counsel are excused.